# GOVERNMENT EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

*AFFIDAVIT OF INV. DEWAYNE R. BAILLARGEON*

State of New York     )
County of Onondaga  ) ss:
City of Syracuse        )

I, Dewayne R. Baillargeon, having been duly sworn, do hereby state and depose as follows:

1. I am an Investigator with the New York State Police (NYSP). I have been employed by the NYSP since June of 2001. I was a uniform trooper before being promoted to investigator in March of 2013. I am currently assigned to SP Massena.

2. On January 29, 2016 I was assigned a case turned over from the Massena PD involving a report by a 16-year-old child, B.L. B.L. disclosed that she had been raped by Stacey J. LaPorte, Jr. Through interviews in January, February, and April of 2016, B.L. disclosed a pattern of rape and sexual abuse by LaPorte that began when she was about 11, but which had become more frequent when she had to move in with LaPorte following her father's death when she was in the 9th grade.

3. On February 18, 2016 I received information that St. Lawrence County Child Protective Services was investigating the possible sexual abuse of two children, ages 3 and 4. I recognized the children to be the biological children of Stacey J. LaPorte, Jr. The children were forensically interviewed by NYSP Inv. Sarah Goodrow at the Child Advocacy Center in Franklin County. No disclosures of abuse were made, but one of the children exhibited behavioral cues that indicated the child was not fully forthcoming when asked questions about LaPorte.

1

3.  On March 16, 2016, E.J., a 10-year-old female child was interviewed by Inv. Leslie Loran at SP Massena. E.J. disclosed that she had been sexually abused by Stacey J. LaPorte. Based upon information provided in her disclosure, E.J. would have been 5 or 6 years old at the time of the abuse.

4.  As a result of these disclosures, on May 17, 2016 at approximately 5:50 p.m. NYSP Trooper Brian LaBarge and I located Stacey J. LaPorte, Jr. at a residence in Massena, NY. I asked LaPorte to come to SP Massena to speak with me about allegations that had been made against him. LaPorte agreed, but stated that he did not have a ride. I told him that Trooper LaBarge could provide a courtesy transport. LaPorte rode in Trooper LaBarge's marked police vehicle. He was not handcuffed. The NYSP radio log confirms that the courtesy transport (CT) from the residence on Main Street[1] began at 5:55 p.m., with an arrival at SP Massena 5:58 p.m. This log is attached hereto as *Attachment 1*.

5.  At the barracks, LaPorte was taken to our interview room. He was still not handcuffed. There is a desk, a filing cabinet, and two chairs in the room. LaPorte sat in one of the two chairs, and I sat in the other. At 6:04 p.m., before any questioning began, I read to LaPorte his *Miranda* rights from a card issued to me by the NYSP. A copy of the card I used to read the rights to LaPorte is made a part of this Affidavit as *Attachment 2*. A copy of the notes I took during the interview, in which I recorded this time exactly, are *Attachment 3* to this Affidavit.[2]

6.  I read each of the rights on the *Miranda* card to LaPorte, verbatim. The card

---

[1] While the radio log indicates "2445" Main Street, this is an error. The address was 245 Main Street.

[2] For purposes of attachment, the notes have been redacted in compliance with 18 U.S.C. § 3509(d)(2)(B) and Local Rule, Criminal Procedure § 1.3.

2

includes two questions at the end: "Do you understand each of these rights I have explained to you?" and "Having these rights in mind, do you wish to talk to us now?" LaPorte answered both: "Yeah." (*See Attachment 3*). He was still not handcuffed.

7. As I was taking pedigree information from LaPorte, Trooper LaBarge knocked on the door. I stepped out of the room. Trooper LaBarge told me that he needed to leave, but wanted me to know that when LaPorte was getting into the car at 5:55 p.m., he stated, without being questioned, "I know my sister is making allegations." I recorded this in my notes, and began the interview of LaPorte.

8. LaPorte and I spoke for less than 90 minutes. We were sitting relatively close to one another during the interview. At no time did I notice the smell of marijuana or alcohol. LaPorte did not slur his words or appear not to understand the conversation. The interview was conversational, and LaPorte was cooperative. His answers were responsive to the questions asked. He never indicated that he was under the influence of alcohol or drugs, and never indicated or showed signs of any impairment. He never asked to stop speaking with me or if he could go home.

9. LaPorte made admissions about his abuse of B.L. I asked him if he had abused any other children, and LaPorte responded: "No. I never touched any other kids."

10. After the interview, LaPorte, still unhandcuffed, accompanied me to my desk area to draft and execute a written statement. I began typing the statement at 7:30 p.m. *See* "Statement Start Time" on *Attachment 4*, Voluntary Statement of Stacey J. LaPorte, Jr.[3] LaPorte

---

[3] This document has also been redacted in compliance with 18 U.S.C. § 3509(d)(2)(B) and Local Rule, Criminal Procedure § 1.3.

sat next to me while I typed the statement. We reviewed the information he had provided as we went through what was to be included in the written affidavit. Throughout the process, LaPorte and I discussed what he wanted the statement to say. I told him this was his statement, and wanted it to say what he wanted it to say. From 7:30 p.m. until 8:30 p.m. LaPorte and I discussed the content of the statement, and I confirmed with him all of the information to be included before it was typed into the document. We completed this process at 8:30 p.m., at which time I typed the time into the "Statement End Time" on the final page of the document, and then printed it.

11. After the document was printed, I asked LaPorte if he could read and write. He said he could. I told him that the rights printed on the form were his rights, as we discussed before we began our interview. I asked LaPorte to read each of the rights, and initial to the left of each to indicate that he read and understood the rights. In my presence, LaPorte read each right one by one. He initialed after each right before reading the next one. When he finished reading and initialing all of the rights, LaPorte read the statement indicating that he understood the rights, agreed to give them up, and to give a statement. He then signed the line underneath that statement.

12. After that, LaPorte read the entire statement in my presence. I asked him if there were any changes he wanted to make to the statement, and he said: "No." LaPorte and I then initialed the top of each page, and he initialed the end of page 1, signed to indicate the end of the narrative portion of the statement on page 2, and signed under penalty of perjury on page 3.

13. Once the statement was executed by LaPorte, I told him he was under arrest for Rape in the First Degree in relation to B.L., and for Sexual Abuse in the First Degree in regard to the allegations made by E.J. Trooper LaBarge came to my desk, and I asked him to process LaPorte while I began writing the state felony complaints. LaPorte accompanied Trooper

LaBarge to the Patrol Room for processing. He was still not handcuffed.

14. On June 17, 2016, I accompanied Inv. Arcadi to the home of Tiffany Matthie. Inv. Arcadi asked Matthie if LaPorte had left any electronic media at her residence. She said no, and consented to a search of the apartment. In my presence, Inv. Arcadi reviewed with Matthie a written Consent to Search. He explained and read the form to her, including the statement that she had a right to refuse consent. Matthie agreed to allow the search and signed the form. Her mother was present at the time, and signed the consent as a witness. Inv. Arcadi and I then searched the residence, and found no media belonging to LaPorte, and left.

Inv. Dewayne R. Baillargeon
New York State Police

Subscribed and sworn to before
me this 13th day of April, 2017
at Syracuse, New York

Notary Public

PAULA D. BRIGGS
Notary Public, State Of New York
No. 6068241
Qualified In Onondaga County
My Commission Expires 12/31/20 17

5

# Attachment 1

| | | | | | | |
|---|---|---|---|---|---|---|
| CB-6 (REV. 12/76) NEW YORK STATE POLICE RADIO LOG SHEET | | | | | SHEET 6 OF 8 SHEETS | |
| STA. CALL LETTERS KED882 | TROOP B | STATION NAME SP CANTON | | | MONTH May | DAY 17 YEAR 16 |
| TRANS. NO. | ITEM NO. | TIME SENT OR RECD. | STA. OR UNIT NO. | SUMMARY OF TRANSMISSION | ORIGINATED BY | ACKNOWLEDGED BY |
| 191 | | 427 | 2B49 | IS | 1009 | 9B25 |
| 192 | | 430 | 2B20 | GAR 9847 SH 68 Lisbon | 1944 | |
| 193 | | 435 | 2B24 | OS 41 New Rd | 372 | |
| 194 | | 444 | 2B30 | OS SP/SL | 1230 | |
| 195 | | 444 | 2B31 | OSS | 2485 | |
| 196 | | 446 | 2B44 | OSS | 2827 | |
| 197 | | 446 | 2B26 | SJS Drug pass | 357 | |
| 198 | | 450 | 2B26 | IS | 357 | |
| 199 | | 500 | 2B20 | OSS | 1944 | |
| 200 | | 502 | 2B31 | IS enroute Quarry rd | 2794 | |
| 201 | | 503 | 2B80 | OS EOT | 2325 | |
| 202 | | 510 | 2B42 | | 356 | |
| 203 | | 511 | 2B36 | IS | 3953 | |
| 204 | | 514 | 2B35 | OSS | 1161 | |
| 205 | | 515 | 2B33 | OSS | 1042 | |
| 206 | | 522 | 2B42 | IS enroute V+T court SA | 2544 | |
| 207 | | 523 | 2B36 | OSS | 3953 | |
| 208 | | 524 | 2B20 | IS | 1944 | |
| 209 | | 529 | 2B22 | OSS | 3617 | |
| 210 | | 530 | 2B43 | IS | 2451 | |
| 211 | | 530 | 2B41 | IS | 2709 | |
| 212 | | 535 | 2B13 | OS Everything Electric | 4921 | |
| 213 | | 537 | 2B14 | OS Everything Electric | 728 | |
| 214 | | 538 | 5B12 | OS residence | 5308 | |
| 215 | | 540 | 2B43 | OSS | 2451 | |
| 216 | | 544 | 2B13 | key holder update | 9B25 | 4921 |
| 217 | | 546 | 2B42 | OS Lawrence crt | 2544 | 9B25 |
| 218 | | 547 | 2B25 | OS SP/ Norfolk | 1429 | |
| 219 | | 550 | 2B41 | OS 9024 SH 56 | 2709 | |
| 220 | | 551 | 2B13 | IS | 4921 | |
| 221 | | 555 | 2B54 | S/m 67032 2445 main st ct | 3297 | |
| 222 | | 556 | 2B32 | IS | 2794 | |
| 223 | | 558 | 2B54 | Elm 67033 @ station | 3297 | |
| 224 | | 600 | 2B27 | IS | 201 | |
| 225 | | 605 | 2B32 | OSS | 2794 | |
| 226 | | 605 | 2B48 | IS | 1864 | |
| 227 | | 607 | 2B20 | OSS | 1944 | |
| 228 | | 611 | 2B16 | OSS | 3538 | 9B25 |

# Attachment 2

GENL-5R2 (06/04)

# NEW YORK STATE POLICE
# MIRANDA WARNING

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer, and have a lawyer present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you free of charge before any questioning if you wish.

5. You may decide at anytime to exercise these rights and not answer any questions or make any statements.

## WAIVER

1. Do you understand each of these rights I have explained to you?

2. Having these rights in mind, do you wish to talk to us now?

# Attachment 3

6:04 pm "yeah"
"yeah"

Stacey J. Laporte, JR    09/23/90
Main St
Massena NY 13662

5:55. I know my sister is making allegations

- Got way of relationship McKenzie no longer together move in two years ago ST. PATRICK DAY DAD DIED
- Move into OTB 2 Willow — w/ 
  / B.L.

sent away from home by case worker
when — 12 when    16 when realsed    2006 or 2007
        entered foster                came home
           care

B.L.
Knew when born — mom-dad separate
sister stay w/ mom. live w/
9 years when released.
half brother was a few month old when released
from naps home.
mom — was Anny old school build 2302 26 prospect
street
    MOLESTED GRANDFATHER

don't remember
- SISTER, B.L. SAID he tRIED to do stuff w/ her.
- one night she woke up and she was on top of her
- tried to do something to her butt and it hurt.
- was old enough to talk
- grandfather's kept abusing — made him touch him really fuck my head up.
- little at grandfather's when you start doing things to B.L. — told it was a game both had pants down rub my dick over her puss. she was 2 or 3 I was 11 or twelve
- abuse wasn't just w/ grandfather. my mom abuse me at night she would smoke weed and drink she would touch me and tell me to got to her room

6:45
- mom would make me have sex w/ her sister was just born — made me put my dick in her pussy. until I 9 or 10 years old it happen 5 or 6. she stopped because I told her my stomach hurt or I had a headache.
- at 12 years old went to live w/ DAD not going to school doing drug.
- B.L. wouldn't come over dad and I would see her at DAD's.
- Before mom die on grantville, 64 grantville road mom when to hospital kept mom overnight me and B.L. were messaging back and forth

- I asked her if she remember what happened when were kids, we were using ~~Post notes~~ post-it's to ~~text back and~~ she said "yep"
- SHE WAS 13 or 14   I was 22
- Started talking about the thing that happen w/ gram
- ~~we a~~ we BOTH agree to have sex, nothing was forced.

No oral   ~~I put my~~
We went in back bedroom and had sex, to me sex is I put my DICK INSIDE of her. I ejaculated on her or on the bed. —
THIS happened 15-20 TIMES over
it was a way we both cope WITH THE abuse by grand~~father~~/mother.
missionary few times she was on top other time she was on her side, or bent over from behind

# Attachment 4

# NEW YORK STATE POLICE

## VOLUNTARY STATEMENT

**COUNTY OF** ST. LAWRENCE            **STATEMENT START TIME:** 7:30 AM/PM
**OF** NORFOLK                         **DATED:** MAY 17, 2016

I, STACEY J. LAPORTE JR., AGE: 25 AND BORN ON: SEPTEMPER 23, 1990, AND RESIDING AT: 52 MAPLE STREET, APARTMENT 3, MASSENA, NEW YORK, HAVE BEEN ADVISED BY: INVESTIGATOR DEWAYNE R. BAILLARGEON, OF THE NEW YORK STATE POLICE, OF THE FOLLOWING:

x  I HAVE THE RIGHT TO REMAIN SILENT AND I DO NOT HAVE TO MAKE ANY STATEMENT IF I DO NOT WANT TO.

x  IF I GIVE UP THAT RIGHT, ANYTHING I DO SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW.

x  I HAVE THE RIGHT TO HAVE A LAWYER PRESENT BEFORE MAKING ANY STATEMENT OR AT ANY TIME DURING THIS STATEMENT.

x  IF I SHOULD DECIDE THAT I DO WANT A LAWYER AND CANNOT AFFORD TO HIRE ONE, A LAWYER WILL BE APPOINTED FOR ME FREE OF CHARGE AND I MAY HAVE THAT LAWYER PRESENT BEFORE MAKING ANY STATEMENT.

x  I ALSO UNDERSTAND THAT I HAVE THE RIGHT TO STOP AT ANY TIME DURING THIS STATEMENT AND REMAIN SILENT AND HAVE A LAWYER PRESENT.

I FULLY UNDERSTAND THESE RIGHTS AND AT THIS TIME, I AGREE TO GIVE UP MY RIGHTS AND MAKE THE FOLLOWING STATEMENT;

*[signature]*

I am at State Police Barracks, in Massena speaking with Investigator DeWayne Baillargeon of the New York State Police with regard to sexual intercourse I have had with my sister, BL. I am giving this statement of my own freewill.

When I was two or three olds, until I was five or six years old, my grandfather, DOUGLAS JUDWARE, abuse me. He would make me touch his dick and he would touch mine. He would make me "jerk him off". It stopped when I was five or six years old because I told my mom and dad. I think an investigation was done and he lost his job as a school bus driver, but no physical evidence and he didn't get charged, he kept living his life. After my sister BL was born, I was nine or ten years old, my mother, MANDY L. LAPORTE started to abuse me. She would always drink and smoke Marijuana at night. She would

END OF PAGE 1
x SL

wake me up by like touching my dick. She would tell me to get into her room and she would get undressed. She would tell me to do stuff to her like finger her, and made me put my dick in her pussy. This would happen almost every night. Especially, when she was drinking and smoking pot and this was for about a year. I was about eleven years old, I went to live with my dad, in Brasher Falls. I stopped going to school and I was drinking and smoking Marijuana. Because of this I got taken away by the case workers. I was sent to foster care in Ogdensburg, then Gouverneur and Heuvelton. I gave everybody at the foster homes trouble. They then sent me to Boy's Home, in Lake Placid and then to jail for beating up one of the staff at Tree Branch. I was 16 years old when I was released from jail, I got accepted back into the boy's home. I was there for a couple of more months, when I got released back to my mom. She lived 26 Prospect Street, in Norwood and I moved in with there with my mother, BL and my little brother, I was only there for about year and I got arrested for accessory to burglary. I was sent back to jail, until I went to court. I got release from jail and I went back to my mother's house. I was about 16 when I moved to Massena, with my mom, my sister and little brother. We moved to Town Line Road. We lived there until I was about 19 years old. We moved from there to 2 Willow Street, Massena, after a house fire. We lived there for a couple of months and then we moved to 64 Grantville Road, in Norfolk. In 2010, my mom found out she had cancer and had to go to the hospital and they kept her overnight. I stayed at the house with BL I think she was 11 or 12 years old. We started texting on my sister's iPod, in the notes app. I was asking her if she remember what Grandpa used to do to us when we were little and she said "yes". We using the same IPod to text back and forth. I would type something and hand it to her. I asked her if she wanted to continue what grandpa started and she said "yes". We back into the bedroom, she took off her own clothes. I took off my clothes. I had an erection, she laid down on the bed on her side. I laid down behind her and put my it inside of her. It was like five minutes, I pulled out of her and ejaculated. I don't remember where it went, she went into the bathroom and cleaned herself up. We got dress and went back out in the living room. My mom, BL and moved to Felts Mills with my mother. I stayed with friends on the Grantville Road. I never sex with BL when she was living in Felts Mills with my mother. My mother died on September 11, 2013, my sister moved back to Brasher Falls with our father. Six months later, my father died and my sister moved in with me and Sinclair Bab, at 2 Willow Street, Massena. We had sex there once or twice, I don't remember the particulars. I did happen a few times when I was drunk. We moved from there to 52 Maple Street, Apartment 2, in the village of Massena. BL and I have sex there two or three more times, it was it always agreed upon by both of us, I never forced her. We moved from Maple to Somerset Avenue. I lived there with Mackenzie Bailey, VI me and BL BL and I had sex two or three times when we lived there, I don't remember all the details, but each time, I stuck my dick in her pussy. I never ejaculated inside of her, I always ejaculated on her or on the bed. We moved to 18 Talcott Street, we had sex four more times, when we lived there. We were there for about 8 months and we moved to the Cabin in Chase Mills. I lived there with Mackenzie, BL and VI Over the next two or three months, we had sex three or four more times. It usually happened when we were alone and I was having a bad day, remembering my abuse and dealing with my parent's death. We lived in the cabin for about two or three months and we moved to Glenn Street, in the Village of Massena. I think we had sex twice, while I lived there. That was when everything happened and she left and ran away. Nikolas Emens came to my house on Glenn Street, to get his Xbox, with my sister BL because I told him I needed to talk to her. I thought she was going to run away. We started talking and asking what was going on and what were her plans. She told me she was not running away and we started arguing. I told her I had enough and we should just die and be with our parents, she took it as a threat. After they left, I tried to get a hold of Nick by calling and texting him because he was supposed to be my best friend. He never answered me back after I text him. I have not had sex with BL since she left my house on Glenn Street.

END OF STATEMENT

(END OF STATEMENT)

| N O T I C E | **Penal Law § 210.45** – IN A WRITTEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR. |
|---|---|

AFFIRMED UNDER PENALTY OF PERJURY

This __17th__ day of __May__ 20 __16__

OR

SUBSCRIBED AND SWORN TO BEFORE ME

This _____ day of _____ 20 ____

SIGNATURE OF DEPONENT

SIGNATURE OF WITNESS

| STATEMENT END TIME: | 8:30 | AM / PM |
|---|---|---|