IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No. 5:16-CR-320 (DNH) |
| v. | |
| | GOVERNMENT'S RESPONSE TO |
| STACEY J. LAPORTE, JR., | DEFENDANT'S SENTENCING |
| | MEMORANDUM |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 26, 2017, pursuant to the Uniform Presentence Order issued by the Court, the United States filed a sentencing memorandum in the above-captioned matter. The Sentencing Memorandum of the United States addressed the Presentence Investigation Report (PSR) only as we had not yet received the defendant's sentencing arguments. The Government reserved its right to respond in writing to any sentencing objections and arguments raised by the defendant after the filing of our memorandum. On September 28, 2017, the defendant filed his sentencing memorandum, and this response is filed in reply to arguments raised therein.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

**I.      Objections to the PSR**

LaPorte challenges (1) the Presentence Investigation Report's application of the sentencing enhancement found at U.S.S.G. § 2G2.1(b)(4), and (2) its conclusion that his Guidelines range is 2040 months, or 170 years. Defendant's Sentencing Memorandum, pp. 1-3. The Government agrees, without qualification, with the responses of the Probation Officer, as set forth in the Addendum to the PSR (pp. 51-53). The PSR correctly calculates the defendant's offense level

and Guidelines range, as well as his "total punishment" of 170 years.  *See United States v. Brown*, 843 F.3d 74, 82 (2d Cir. 2016) ("The district court correctly determined that the Guidelines range was 110 years based on the stacking maximums for the three production counts, which each carried a statutory maximum of 30 years, and the two possession counts, which each carried a statutory maximum of 10 years.") and *United States v. Howells*, 676 Fed. App'x. 55, 57-58 (2d Cir. 2017) (rejecting defendant's "life expectancy" argument, and finding that the court did not err in stacking maximum sentences on all offenses of conviction to arrive at a "total punishment" of 580 years).

**II.     The Nature and Circumstances of the Offense**

Not surprisingly, the defendant spends little time discussing the nature and circumstances of his horrendous offenses.  Nor does he accurately characterize the nature of his crimes.  Instead, he posits that "while appalling" his federal offenses are not as significant as the "underlying state charges."  Defendant's Sentencing Memorandum, p. 5.  He leaves out that his federal charges involve the repeated sexual exploitation of two infants, and his coercion of an incestuous relationship between a 12 year old boy and the boy's 16 year old sister, while the state charges - to which LaPorte entered into an agreed-upon plea and sentence of 50 years - relate to entirely different appalling offenses.  Moreover, nothing in the four sentences devoted to this argument explains why LaPorte's commission of additional atrocities should in any way lessen his sentence here.

In St. Lawrence County Court, and after his federal conviction, LaPorte pled guilty to the *forcible rape* of his sister both in 2009 when she was 9 years old, and in 2014, when she was 14.  He also pled guilty to the *forcible rape* of the 16-year-old victim of his federal offense (V-3) - on an entirely different occasion than the federally-charged coerced incest.  Additionally, he pled

2

guilty to the *forcible sexual abuse* of yet another victim – K.S. a 15 year old child - who he denied he even knew during his trial testimony. PSR ¶¶ 62, 145. While each of these state offenses are horrendous in and of themselves, to say that the sexual exploitation of his federal victims "pales in comparison" is absurd.   The anal rape and sexual exploitation of infants is certainly the most depraved of LaPorte's seemingly unending list of depravities.

### III.    The History and Characteristics of the Defendant

#### A.    Childhood History

There is no doubt that the defendant was a very troubled child, with neglectful and addicted parents and a sexually abusive grandfather (his sister corroborates that the children were sexually abused by their grandfather – but refutes the defendant's claim that the grandfather forced her and the defendant to engage in sexual conduct with one another).   However, this is not a case where childhood circumstances might mitigate a life sentence – instead, they support it.

> Even if such characteristics[1] do make it more difficult for a person to comply with the law, the question, unaddressed by the defendant, would remain whether they require a shorter sentence or a longer sentence than would be appropriate for a defendant who lacked those characteristics. *The more difficult it is for a person to resist a desire for sexual contact with children, the more likely he is to recidivate, and this is an argument for a longer prison sentence.* And on grounds of deterrence as well as incapacitation, for the stronger the impulse to commit a criminal act, the greater must be the threat of punishment in order to deter it.

*United States v. Beier*, 490 F.3d 572, 574 (7th Cir. 2007) (emphasis added); *see also United States v. Soloman*, 550 F. App'x 86, 90 (3d Cir. 2013) ("While the District Court recognized the difficult nature of Soloman's childhood, it reasonably concluded that his recidivist nature, his disregard for the law and others, his lack of remorse for his actions, and his disrespect toward the Court all

---

[1]    The characteristics in *Beier* were: childhood sexual abuse, low IQ (83), depression, and learning disabilities. 490 F.3d at 573.

*warranted an enhanced sentence*.") (emphasis added); *cf. United States v. Kluball*, 843 F.3d 716, 718–19 (7th Cir. 2016) ("incapacitation (physically preventing the defendant from committing crimes on 'the outside,' by imprisoning him) is an authorized factor for a judge to consider in determining the length of a prison sentence. This is so even if the defendant's difficulties refraining from criminal conduct result from mental illness.) (internal citation and quotation marks omitted).

As the trial testimony showed, LaPorte used stories of childhood abuse to convince, coerce, and manipulate Mackenzie Bailey and Hillary Trimm into allowing him to have sexual contact with their babies.  He told each of them that he suffers actual physical pain because of childhood sexual abuse, and that the only way to alleviate that pain is to have sex with children.  He claimed to have a physical need to rape their infants, and then did so on numerous occasions. PSR ¶¶ 33, 37, 39, 40, 41.  By his own words and deeds, LaPorte's crimes against these most vulnerable of victims are the result of an inherent and compelling need to abuse children in the most vile ways. Additionally, LaPorte has never hesitated to use the memory of his deceased parents to gain advantage.  As the record shows, he consistently invoked their memories to coerce and require others to engage in illicit sexual conduct.[2]

It cannot be overlooked that other than corroboration by the defendant's sister that their grandfather was an abuser, all of the defendant's other claims of sexual abuse are self-reported by

---

[2]  As the trial testimony showed, LaPorte often swore on the memory of one or both of his deceased parents, and he admitted in his own testimony that to him this was a solemn oath.  The evidence at trial showed that the types of things LaPorte swore to in this regard were often, if not exclusively, related to illicit sexual activities. For example, Government's trial exhibit 23 contains chat messages between LaPorte and Mackenzie Bailey in which LaPorte is furious that Bailey's teenage brother will not engage in sexual contact with Bailey at LaPorte's request, and LaPorte makes several references to how he is going to "freak out" if it does not happen, because, as he explains: "I put this on my dad babe u know how I am it needs t happen now."  Exhibit 23, p.10, line 363 (text as in original).

a man who has proven – in this very case - that he will lie to attempt to avoid accountability for his crimes.  For example, LaPorte testified at trial that he would never harm a child, and knew that it was wrong.  Yet four weeks later he pled guilty in state court to four counts of forcible rape and sexual abuse of three different children.  *See* PSR ¶¶ 62, 145.  Moreover, many of the defense's allegations relating to LaPorte's childhood abuse are not in any record, or even a statement of the defendant, but instead come only in the memorandum of counsel.

While child protective (CPS) records corroborate that LaPorte's parents were neglectful, abused drugs and alcohol, and allowed him to do the same, what they also show is that extraordinary efforts were made to intercede on his behalf.  The records, spanning most of LaPorte's childhood, show the consistent monitoring and intervention that led to his removal from the home.  However, LaPorte's serious behavioral issues in three different foster homes led to his mandated placement in a residential facility, where he continued to be a problem, leading to extensions of his placement until he turned 17.  Less than 2 months later, he was arrested for Attempted Robbery in the Second Degree.  PSR ¶ 152.

While the CPS records show that LaPorte's upbringing was substandard, sadly, so too is the case with many other defendants similarly situated, and accordingly not a grounds for departure.  *United States v. Vela*, 927 F.2d 197, 199 (5th Cir. 1991) ("Childhood abuse and neglect are often present in the lives of criminals. They always affect their mental and emotional condition. 'We simply cannot agree, therefore, that these are the kinds of considerations which warrant substantial reductions in guidelines sentences.'") quoting *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989)(internal citation omitted); *see also United States v. Brady,* 417 F.3d 326, 334 (2d Cir. 2005) ("because it is the sad fact that so many defendants have unfortunate pasts," there is a

high standard of what constitutes an atypical case that would merit a sentencing departure.)

Stacey LaPorte stands convicted in two courts of horrific sex crimes committed against six different children over the course of several years. He now asks this Court to find that his background – which he used as an excuse to commit his crimes – is an excuse to treat him leniently. Such duplicity cannot be abided. Nor can the additional hypocrisy in the fact that LaPorte falsely testified that he did not - and would never - engage in such activity with any child, only to, weeks later, plead guilty to forcible sex crimes against three children. All of these factors support a longer, not a shorter, period of incarceration. *See Beier* and *Soloman*, supra.

### B. The Defendant's "Education and Talent"

The defendant asks this Court to consider his artistic talent as a factor in support of a "downward departure." Defendant's Sentencing Memorandum, p. 10, and Attachment A. There is a reason that counsel cites no support for such an outlandish request. First, it impermissibly suggests that a defendant who can draw (or sing, or dance, perhaps) could or should be afforded a leniency not available to others who do not possess the same "talent." More importantly, drawing pictures to make other inmates happy will never mitigate LaPorte's crimes, nor will it ever return to his several victims the sanctity of childhood stolen from them.

### C. Age and Recidivism

Acknowledging that there is "some evidence that sex offenders pose a higher risk of recidivism tha[n] other criminal defendants," the defendant nevertheless puts forth a rather weak argument about age-based recidivism, arguing, in general, that he has a reduced likelihood of recidivism (of crimes he has denied committing, by the way) were he to be released after serving only a 30 year sentence. Defendant's Sentencing Memorandum, p. 11. However, there are

several reasons to doubt the proposition that the rates of recidivism for child pornography offenses follow a general pattern of decreasing recidivism with age.

First, as the Sentencing Commission's statistics show, among all offenders sentenced in 2016 for child pornography offenses (which includes those convicted of production, receipt, distribution, and possession), almost half (46%) were 41 years of age or older, and *more than half* of that age group were over 50. *See* United States Sentencing Commission, Sourcebook 2016, at Table 6. The percentages for these age groups were slightly *higher* in each of the preceding seven fiscal years – 2015, 2014, 2013, 2012, 2011, 2010, and 2009. *See* United States Sentencing Commission, Annual Reports and Sourcebooks Archives, available at: https://www.ussc.gov/research/sourcebook/archive/sourcebook (Table 6 for each year) (last visited Nov. 7, 2017). The notion that LaPorte will "age out" of this type of offense is belied by these statistics.

Second, numerous studies have shown that the rate of reporting of child exploitation crimes is extremely low, indicating that any recidivism rates based on records of arrest or conviction should be viewed as underestimates.[3] As the Sentencing Commission has noted in its report on the child pornography guidelines, "[i]t is widely accepted among researchers that sex offenses against children often go unreported and undetected," a factor that "always should be considered is assessing the results of a sex offender recidivism study based solely on reported arrests or

---

[3]  *See, e.g.*, Ryan C.W. Hall & Richard C.W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 MAYO CLINIC PROC. 457, 460-61 (2007); K. London, M. Bruck, S.J. Cedi & D.W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 PYSCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Assoc. 2005).

convictions." United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* (Dec. 2012), at 295.  Children are particularly reluctant to talk about sexual abuse.  J. Bonta & R.K. Hanson, *Gauging the Risk for Violence: Measurement, Impact and Strategies for Change* (1994) (published by the Solicitor General of Canada, Ministry Secretariat (Ottawa).   As one study has noted:

> The most serious problem with estimating overall recidivism rates . . . is that a substantial proportion of sexual offenses remain undetected. Comparisons between police statistics and victimization surveys indicate that most sexual offenses, particularly offenses against children, never come to official attention. It is also implausible to expect that the offenders themselves will provide thorough accounts of their undetected sexual crimes.  Consequently, any empirical estimates of sexual offenders' recidivism rates should be considered *underestimates*.

R. Karl Hanson and Monique T. Bussière, *Predictors of Sexual Offender Recidivism: a Meta-Analysis* 1996-04, available at http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/prdctrs-sxl-ffnd/index-eng.aspx. (Last visited Nov. 7, 2017) (emphasis added).

Other studies have highlighted the danger of relying on arrest or conviction records to assess the prevalence of child sex offenses.  For example, in one recent study of child pornography offenders, the authors found that if arrests and convictions were the only indicator used, the percentage of these offenders who had prior contact offenses with children was low – approximately twelve percent. Where, however, studies used polygraph testing, or some other means to insure honest, self-reporting (such as anonymity or immunity from prosecution as part of a treatment program), the numbers were radically different.  The studies with these types of validation determined that over half such offenders admitted prior sexual contacts with children. Angela W. Eke, Michael C. Seto & Jennette Williams*, Examining the Criminal History and Future Offending of Child Pornography Offenders:   An Extended Prospective Follow-up Study*, 35 L. &

8

Human Behavior 466, 476 (2011).  The authors of this study also observed that while recidivism rates (*i.e.* rearrest rates) were low for the child pornography offenders studied, these rates increased over time, as the period in which these offenders were followed extended from approximately 2.5 years to 5.9 years.  Thus, the rate of contact sexual offenses for these individuals increased from 4.5% during the original period to 6.0%, while the rate of noncontact sexual offenses rose from 6.5% to 11.0%.  *Id*. at 470.  The study thus indicated that the longer a child pornography offender remains in the community, the greater the likelihood that he will reoffend.

It is also important to note that under prevailing diagnostic criteria, a pedophile is an individual over the age of sixteen, who fantasizes about, is sexually aroused by, or experiences sexual urges or behaviors towards prepubescent children ("generally age 13 or younger") for a period of at least 6 months, and who is at least five years older than the juvenile of interest. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5) (2013), at 697, Diagnostic Criteria 302.2.  The record before the court indicates a likelihood that LaPorte is a pedophile, given that over a period of several years he engaged in sexually explicit conduct with several minors, including infants.  Importantly, research indicates that "pedophiles offend in their later years at a *greater rate* than other sexual offenders." Hall & Hall, *A Profile of Pedophilia,* 82 Mayo Clinic Proc. 457, at 458 (emphasis added).  In one study, researchers found that, of their sample of 168 sex offenders (rapists, pedophiles and sexual sadists), 44% of the pedophiles were in the older adult age range (age 40-70 years), and that when compared to other types of sex offenders, pedophiles comprised 60% of all older offenders.  *Id*.

Given the pedophilic nature of LaPorte's offense conduct, the likelihood that recidivism rates for child sex offenses are underestimates, and the statistics showing the large percentage of

9

child pornography offenders sentenced in the federal system each year are above forty years old, the Court should reject LaPorte's argument that his risk of reoffending would be decreased after serving only a 30 year sentence.

## IV.   CONDITIONS OF DETENTION

The defendant argues that he suffers from health issues that have rendered his pre-trial detention so "harsh" as to warrant a downward departure.  Defendant's Sentencing Memorandum, pp. 11 – 12.  Specifically, the defendant maintains that because (1) he has lost 46 pounds, (2) is receiving medication for a pre-existing condition, (3) has gallstones, (4) suffers tooth pain, and (5) takes pain and blood pressure medication, he should be afforded leniency in sentencing.   This is startling, given that the defendant made little or no efforts to deal with any of his health issues before his incarceration, reporting that "he has a number of physical health problems for which he received little care *prior to his arrest* because he did not have a primary care physician."   PSR ¶ 154 (emphasis added).   In contrast, and as detailed in the PSR (¶¶ 155 – 56), LaPorte has been afforded a great deal of medical care at the facilities where he has been detained.   The fact is, the defendant's health has been monitored and attended to only since his incarceration, and that is a *good* thing, not a reason for departure.

Moreover, while LaPorte complains about his weight loss, what he does not mention is that at 5'6" tall (PSR ¶ 153) his reported pre-incarceration weight of 210 pounds, (Defendant's Sentencing Memorandum, p. 11) is considered obese, putting him at higher risk for serious health issues.   https://www.cdc.gov/obesity/adult/defining.html (Last visited Nov. 7, 2017).   Even his currently-reported weight of 164 pounds, while healthier, is still considered overweight, presenting risk factors that further weight loss could alleviate.   *Id*.

Regardless, LaPorte attempts to use issues caused by his unhealthy lifestyle as a means to achieve sentencing consideration, and cites *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) in support.  *Carty* holds that a court has the discretion to take conditions of severe pre-sentence confinement into account "in appropriate cases." *Id*. at 196.   This is not that case.   Nothing like LaPorte's complaints of pain and nausea, the defendant in *Carty* had been detained in the Dominican Republic for nine months in conditions described as follows:

> He was held in a four-foot by eight-foot cell with three or four other inmates. There was no light in his cell. He received ten to fifteen minutes per day outside of his cell to bathe and was allowed to make only one phone call per week. He had no running water in his cell. His only toilet was a hole in the ground. He was denied access to paper, pens, newspaper, and radio.

*Id*. at 193.   Even so, the Court of Appeals did not hold that these conditions were sufficiently severe to merit departure, only that the district court was not precluded from taking them into consideration.   LaPorte's argument gains no further traction with his other cited case, *United States v. Francis*, 129 F.Supp.2d 612 (S.D.N.Y. 2001).   There, the district court granted a downward departure for pretrial confinement in a case where the U.S. Marshals Service failed to move the defendant to another facility despite the fact that the Court had ordered it to do so, and where, after extensive hearings, it found, among other things, that during his confinement:

> Defendant was the victim of an attempted knife slashing by another inmate and observed frequent fights between inmates; he was threatened by other inmates and gangs; the gang control of the telephones was a constant reminder of his insecurity; he was also denied access to a library with Spanish materials-the only kind that he could read; the visitation procedure sometimes denied him contact visits with his family and thrice denied him any type of visit at all; counsel visits were unusually complicated; he lost approximately twenty pounds and had insomnia; and he was forced to live in the overcrowded situation of a prison operating at 150% of its capacity, with the daily stress and fear as a result of the overall lack of security and the presence of gangs.

*Id*. at 619.

11

## V. CONCLUSION

The Government maintains that the defendant has raised no meaningful fact or reason to depart or vary from the sentence recommended by the Guidelines. There is no factor or combination of factors which mitigate the gravity of his many offenses and the danger he poses to children, and there is simply no reason to impose anything less than the recommended life (170 year) sentence.

Respectfully submitted this 14th day of November, 2017

GRANT C. JAQUITH
Acting United States Attorney

*/s/ Lisa M. Fletcher*
Lisa M. Fletcher
Assistant United States Attorney
Bar Roll No. 510187

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

******************************************

UNITED STATES OF AMERICA,  Criminal Action No.
                           5:16-CR-320 (DNH)
     v.

STACEY J. LAPORTE, JR.

     Defendant.
******************************************

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2017, I electronically filed the GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM with the Clerk of the District Court using the CM/ECF system.

    Randi Juda Bianco, AFPD

                    /s/
                    Paula Briggs